LOUISVILLE BLACK POLICE
OFFICERS ORGANIZATION,
INC., et al, Plaintiffs,

v.

CITY OF LOUISVILLE et al,
Defendants.

Civ. A. No. C 74–106 L(A).

United States District Court,
W. D. Kentucky,
Louisville Division.

Sept. 18, 1979.

Frederick Cowden, Paul M. Soreff, William H. Allison, Jr., Henry B. Hinton, Jr., Juanita Christian, Louisville, Ky., Patrick O. Patterson, New York City, for plaintiffs.

Winston King, Louisville, Ky., for defendants.

Henry Triplett, Louisville, Ky., for intervening defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALLEN, Chief Judge.

This action is submitted to the Court for decision after five weeks of trial on issues concerning alleged discrimination by the City of Louisville, the Louisville Civil Service Board, the Director of the Civil Service Board, and the Chief of Police, with regard to recruitment, entry level testing, selection, and hiring. Also pending before the Court is the motion of the plaintiffs for a preliminary injunction with respect to the use by the defendants of the Multi-jurisdictional Police Officer Examination, Test 165.1, hereinafter, the MPOE 165.1.

The action was commenced in March, 1974, and was brought under 42 U.S.C. Secs. 1981 and 1983, alleging violations of the Fourteenth Amendment rights of the plaintiffs. The complaint was amended in January, 1976 and March, 1977, to allege claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Sec. 2000e et seq., and to drop and add plaintiffs.

The present plaintiffs in the action are the Louisville Black Police Officers Organization, Inc., hereinafter, the BPO; Shelby Lanier, Jr., the President of the organization, and Gary Hearn, both of whom are black police officers employed in the Louisville Division of Police; and Ronald Jackson, James Steptoe, and Len Holt. In addition to the defendants previously referred to, the Fraternal Order of Police, Louisville Lodge No. 6, hereinafter the FOP, and its President intervened as defendants.

On June 27, 1975, the Court entered an order determining the action was maintainable as a class action under Rule 23, Federal Rules of Civil Procedure. Subsequently, the order was amended on April 22, 1977 to provide that the BPO and Shelby Lanier, Jr. represent a class composed of black persons who are or would have been police officers employed by the City of Louisville, and who allege that the rules and practices of the defendants have discriminated against black police officers with regard to assignment, promotion and discipline of personnel.

The second portion of the order, and the one which is particularly applicable here provides, in substance, that plaintiffs Jackson, Steptoe, Holt, and Hearn were designated as class action representatives for black persons who had allegedly been denied employment by the Louisville Police Department, hereinafter the LPD, on the basis of arbitrary, capricious and racially discriminatory practices on the part of the defendant. The class also consisted of all black applicants for positions with the LPD, who will, in the future, seek jobs with it and who may be denied employment because of the allegedly discriminatory and arbitrary practices set out in the complaint.

■ Prior to launching into a discussion of the merits, the Court must address again the contentions made by the defendants that this action should be dismissed because none of the class action representatives were rejected employment because of their failure to pass written tests promulgated by the defendants, and more specifically, the MPOE 165.1. The Court is of the opinion that the motion to dismiss is not well taken, since it appears from the record that plaintiffs Jackson and Steptoe were denied employment by the LPD, even though such denial occurred either because of an alleged physical defect or after the plaintiffs had been admitted to the recruit school but dismissed from that school prior to being employed by the LPD. Plaintiff Holt was denied entrance to recruit school.

The designation of the class action representatives is broad enough to confer capacity upon the class action representatives to put in issue all of the allegedly arbitrary, capricious and racially discriminatory practices on the part of the defendants with reference to employment, hiring practices and recruiting, even though these plaintiffs did not suffer concrete injury as a result of the individual defendant's use of the MPOE 165.1.

Before launching into a discussion of the significant factual findings of the Court, the following legal principles are outlined as an appropriate frame of reference. First, this action was filed in March, 1974, and plaintiff Hearn filed his EEOC claim of discrimination on June 8, 1974. The appropriate statute of limitations which applies to the claims under 42 U.S.C. Secs. 1981 and 1983 is K.R.S. 413.120, which is a five-year statute and, therefore, plaintiff, in order to prevail on its constitutional claims, must prove discriminatory acts and intent occurring after March 13, 1969. See *Garner v. Stephens,* 460 F.2d 1144 (6th Cir. 1972). Insofar as the Title VII claim of the plaintiffs is concerned, the liability period commenced on August 8, 1973, which is 300 days prior to the date on which the charge was filed. See *United Air Lines Inc. v. Evans,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977); *Wetzel v. Liberty Mu-*

*tual Insurance Company,* 508 F.2d 239 (3rd Cir.), cert. denied, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975).

Secondly, in order to prevail on their constitutional claims, plaintiffs must prove not only disparate impact but also a purpose to discriminate. See *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Village of Arlington Heights v. Metropolitan Housing Development Corporation,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Arnold v. Ballard,* 448 F.Supp. 1025 (N.D.Ohio 1978), and the cases cited therein at p. 1028.

■ As noted by District Judge Lambros in his excellent opinion in *Arnold v. Ballard, supra,* the great majority of the courts of the district and circuit courts of appeals which have dealt with this question have come to the conclusion that discriminatory intent is a necessary element of a constitutional violation since the decision in *Washington v. Davis, supra,* although, as he points out, two courts, to wit: the Ninth Circuit in *Davis v. County of Los Angeles,* 566 F.2d 1334, 1340 (9th Cir. 1977) and the Northern District of Indiana in *Dawson v. Pastrick,* 441 F.Supp. 133, 140 (1977), held to the contrary. This Court is convinced of the logic of Judge Lambros' holding in *Arnold v. Ballard, supra,* and follows it.

Next, we note that in *Washington v. Davis, supra, Village of Arlington Heights v. Metropolitan Housing Development Corporation, supra,* and *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977) it is not always necessary to produce evidence showing the subjective state of mind of the defendant in a constitutional action based on 42 U.S.C. Secs. 1981 and 1983 alleging denial of the Equal Protection Clause of the Constitution. The pertinent portions of the cases cited above are discussed in *Arnold v. Ballard, supra,* at pp. 1029–1031.

■ The crux of the decisions is that an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, and in determining whether an invidious discriminatory purpose is a motivating

factor in a decision requires a sensitive inquiry of the circumstantial and direct evidence of intent as may be available. As noted in *Castaneda v. Partida, supra*, 430 U.S. at p. 494, 97 S.Ct. at p. 1280, footnote 13:

"If a disparity is sufficiently large, then it is unlikely that it is due solely to chance or accident, and, in the absence of evidence to the contrary, one must conclude that racial or other class-related factors entered into the selection process."

■ Finally, as to the cause of action brought under Title VII, the burden of proof imposed upon the plaintiff is the same as that imposed upon him in actions against private employers. See *United States v. City of Chicago*, 573 F.2d 416 (7th Cir. 1978) and *Harrington v. Vandalia-Butler Board of Education*, 418 F.Supp. 603 (S.D.Ohio 1976), also *Firefighters Institute, etc. v. City of St. Louis*, 549 F.2d 506 (8th Cir. 1977).

Since plaintiffs' case rests largely on statistics, we examine the holdings of the Supreme Court in *Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977); *Dothard v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977); and *Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). In *Teamsters*, the court approved the comparison between the percentage of blacks on the employer's work force and the percentage in the general area-wide population because the job skill there involved was one that many persons possessed. In *Hazelwood*, 433 U.S. at p. 308, 97 S.Ct. at p. 2741, footnote 13, the court pointed out that "(w)hen special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value." In *Hazelwood* the Supreme Court was discussing the government's argument that the relevant labor market was St. Louis County and the City of St. Louis, whereas the School District was contending that the relevant labor

market was St. Louis County alone. The court indicated by its opinion that it was possible that the district court might finally conclude that either the government's contentions or the defendant's contentions were correct, or might take, very possibly, an intermediate figure.

In so holding, the Supreme Court noted the School District's argument that because the City of St. Louis had made a special attempt to maintain a 50% black teaching staff, the inclusion of that School District in the relevant labor market area distorted the comparison between the number of blacks hired by the School District and the number in the relevant labor market.

In *Dothard v. Rawlinson, supra*, the Supreme Court pointed out 433 U.S. at p. 330, 97 S.Ct. at p. 2727 that there is no requirement that a statistical showing of disproportionate impact must always be based on analysis of the characteristics of actual applicants, citing *Griggs v. Duke Power Company*, 401 U.S. 424, 430, 91 S.Ct. 849, 853, 28 L.Ed.2d 158. As pointed out in *Dothard*, the application process might not adequately reflect the actual potential applicant pool, since otherwise qualified people might be discouraged from applying because of a self-recognized inability to meet the very standards challenged as being discriminatory. See 433 U.S. at 330, 97 S.Ct. at 2727.

In the case at bar, plaintiffs contend that the relevant labor market is the City of Louisville. Defendants contend that the relevant labor market is the Louisville and Jefferson County Standard Metropolitan Statistical Area, hereinafter SMSA. In order to determine what standard should be used to compare the actual number of black police officers employed with the relevant labor market, many considerations must be evaluated. First, we start with the regulations of the Louisville Police Department that its officers must live within 20 miles of the Jefferson County Courthouse, which is located in Louisville, and that all applicants must be in the age range of 21 to 35. The SMSA comprises Louisville and Jefferson, Oldham and Bullitt Counties in Kentucky, and Floyd and Clark Counties in Indiana.

Small portions of the population contained in the four counties live more than 20 miles from the courthouse, but their numbers do not significantly affect the statistics.

The following statistics compiled from the census of 1970 are of significance. First, the general black population was 23.8%. Next, the black population 20 to 34 years old was 21.2%. Next, Jefferson County had a general black population of 13.3% blacks, and 11.5% blacks in the age range of 20 to 34. The SMSA, including Oldham and Bullitt Counties, had a general black population of 11% and blacks in the civilian labor force constituted 9.8%.

Next, we note that the defendants did not maintain any records concerning the racial composition of the applicants they had for admission to the Police Department until 1973. Statistics show that since 1973, the percentage of black applicants compared to the total number of applicants is 18.7%. Other significant statistics are that in 1974, 42% of the applicants were from Louisville, 39% were from Jefferson County, and 19% were from other areas not defined. In 1975, 50% of the applicants were from Louisville, 31% were from Jefferson County, and 19% were from other areas not defined. However, since the regulations require the applicants to live within 20 miles of the courthouse, it may be conclusively inferred that those applicants who did not live in Louisville or Jefferson County either resided in the SMSA or would have to move their residences to that area in order to obtain a job with the Department.

There was also evidence by Col. Nevin to the effect that only 33% of the police officers lived in Louisville, but this was not based on any population tables or other documents, and is of little significance.

Taking into consideration the above factors and attempting to weigh them precisely is an impossible task. If we accept the proposition that 21.2% is an appropriate figure for the relevant labor market in the City of Louisville for blacks, and that 11.5% is the appropriate figure for the relevant labor market in Jefferson County, and that

10% is the relevant labor market for the SMSA, and then apply the figures compiled in 1974 as to the residences of those applying for positions in the Police Department, and attempt to weigh the three figures by giving appropriate weight to the relative populations of each of the three geographic areas, we come out with a figure which is somewhere in the neighborhood of 15.2%. If we also take into consideration the fact that 18.7% of the applicants in 1977 for positions in the Department were black, then a figure of approximately 17% as constituting the relevant labor market might be acceptable.

■ However, we also must give some weight to the fact that the percentages of blacks shown in the SMSA and in Jefferson County are given undue emphasis by reason of the fact that these areas and figures also comprise the blacks in the City of Louisville. To give the figures of 21.2% for blacks in the City of Louisville the same weight as the figures for Jefferson County and the SMSA results in a distortion. Taking into consideration all of these factors, the Court concludes that 15% would be a fair figure by which to measure the hiring practices of the defendants. All parties agree that the percentages of blacks on the Police Force during the years 1964 through 1977 varied from 6.1% in 1964 to 7.4% in 1977, with a low of 5.6% in the years 1972 through 1974.

Defendants admit that there is an under-representation of blacks on the Louisville Police Force, even assuming that the SMSA is the relevant labor market. They contend, however, and correctly if the SMSA is the relevant labor market, that the under-representation is not statistically significant under the principles set out in *Castaneda v. Partida, supra*. In *Castaneda*, the evidence showed that the population of the county was 79.1% Mexican-American, whereas only 39% of the persons summoned for Grand Jury service were Mexican-American. The court held that this evidence was sufficient to prove a *prima facie* case of discrimination.

In *Turner v. Fouche*, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970), there were 60% blacks in the general population and 37% on the Grand Jury list. This was held to be proof of discrimination, as was the case in *Whitus v. Georgia*, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967), where the number of blacks amounted to 27.1% of the taxpayers but only 9.1% of those on the Grand Jury panel. The Supreme Court, in *Castaneda v. Partida, supra,* 430 U.S. at p. 496, 97 S.Ct. at p. 1281, footnote 17, discussed the theory of standard deviations and the application of statistics in jury discrimination cases. The court defined a "standard deviation" as the square root of the product of the total number in the sample which was 870 times the probability of selecting a Mexican-American times the probability of selecting a non-Mexican-American, which pointed out that the standard deviation shown was approximately 12. It then went on to observe that if the difference between the expected value and the observed number is greater than two or three standard deviations, then the hypothesis that the jury drawing was random would be suspect to a social scientist.

In the instant case, we do not have the benefit of the applicant flow until 1973. However, we do have since that time not only the applicant flow but reliable statistics showing the percentage of blacks employed. With relation to the percentage of blacks accepted for employment, the following statistics are significant:

For the years 1969 through 1977, 342 white persons were accepted into the recruit class as against 38 black persons. However, 32 of the 38 blacks accepted into the recruit class were accepted in 1974 and 1975, and only 1 black has been accepted in the years 1976 and 1977, as against 38 whites. Also to be considered is the fact that some 84 blacks did apply to the Police Department during the period July through December, 1973 and only 2 of these blacks were accepted. If these figures are to be taken as significant, it is apparent that blacks were significantly underrepresented for the years 1969 through 1973 and 1976 through 1977, whereas they were overrepresented in 1974 and 1975. A table showing the year-by-year comparisons is appended to this opinion.

While this statistic alone may not be sufficient to give *prima facie* status to plaintiffs' constitutional claims during the years 1969–73, it may have resulted when there is taken into consideration the evidence that the defendants did not have a validated entrance examination during those years, and, in addition, had an unstructured subjective oral interview. While those interviews were held before a board of five persons, at least one of whom was black and usually two, the person apparently having the greatest participation in the interviews was Col. Jack Richmond, a white man whose actions were described by former Director of Safety James Thornberry as being "a bit rough". In addition, there must be considered the fact that the invalidated written examination was given a weight of 65%, the oral examination a weight of 25%, and a weight of 10% was given for previous training and experience.

Since the decision in *Washington v. Davis, supra* and *Village of Arlington Heights v. Metropolitan Housing Development Corporation, supra,* the Court's attention has not been called to any case that actually decides whether statistics showing a severe disparate impact, together with the elements of an invalidated written entrance examination and a subjective oral interview, are sufficient to prove intentional racial discrimination under 42 U.S.C. Secs. 1981 and 1983. In view of the lack of authorities on this subject, this Court observes that a fair reading of *Washington v. Davis supra, Village of Arlington Heights v. Metropolitan Housing Development Corporation, supra,* and *Castaneda v. Partida, supra,* makes it reasonably clear where there is a dramatic disparity, the line between discriminatory purpose and discriminatory impact becomes blurred, and it really does not matter whether the standard is phrased in terms of purpose or effect.

Also, it seems reasonably clear that if a substantial underrepresentation of

blacks occurs in a selection process and the selection procedure is susceptible to abuse, as was the case in the years 1969–73 because of the invalidated written examination and the subjective oral interview, this supports the presumption of discrimination raised by the statistical showing, and a *prima facie* case of discriminatory purpose is made out.

The analysis made by the Court in the preceding two paragraphs is based on the following language of Mr. Justice Stevens found in his concurring opinion in *Washington v. Davis, supra,* 426 U.S. at p. 254, 96 S.Ct. at p. 2054:

"My point in making this observation is to suggest that the line between discriminatory purpose and discriminatory impact is not nearly as bright, and perhaps not quite as critical, as the reader of the Court's opinion might assume. I agree, of course, that a constitutional issue does not arise every time some disproportionate impact is shown. On the other hand, when the disproportion is as dramatic as in *Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110; or *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220, it really does not matter whether the standard is phrased in terms of purpose or effect."

See, also, the following language in *Castaneda v. Partida, supra,* 430 U.S. at p. 494, 97 S.Ct. at p. 1280:

"Thus, in order to show that an equal protection violation has occurred in the context of grand jury selection, the defendant must show that the procedure employed resulted in substantial underrepresentation of his race or of the identifiable group to which he belongs. The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied. *Hernandez v. Texas,* 347 U.S., at 478–479, 74 S.Ct., at 670–671. Next, the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a

significant period of time. *Id.,* at 480, 74 S.Ct. at 671. See *Norris v. Alabama,* 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935). This method of proof, sometimes called the 'rule of exclusion,' has been held to be available as a method of proving discrimination in jury selection against a delineated class. *Hernandez v. Texas,* 347 U.S., at 480, 74 S.Ct. at 671. Finally, as noted above, a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing. *Washington v. Davis,* 426 U.S., at 241, 96 S.Ct., at 2048; *Alexander v. Louisiana,* 405 U.S., at 630, 92 S.Ct. at 1225. Once the defendant has shown substantial underrepresentation of his group, he has made out a prima facie case of discriminatory purpose, and the burden then shifts to the State to rebut that case."

The Court notes that while plaintiffs failed to produce specific instances of disparate treatment during the years 1969–73, there was substantial proof of practices on the part of the Police Department prior to those years, a few of which continued into that period, which were discriminatory. For example, blacks were assigned only to walking beats until 1964. The percentage of black officers as compared to white officers was in the same percentage range as the number of blacks who were on the Police Force as compared to whites, but was substantially below the percentage of blacks in the relevant labor market. Although one black, Wilson Edwards, rose to the position of Director of Safety of the City of Louisville, thereby being the civilian in charge of the Police Department, no blacks are on the staff of the Chief of Police, an organization which sets policies, although, at present, there is Mr. McAnulty, a black, who is an Assistant Director of Safety. Also, not until the late 1960's or early 1970's were blacks admitted to the more prestigious special squads of the Police Department.

 The Supreme Court has recognized that evidence of pre-Title VII discrimina-

tion may have probative force. See particularly footnote 15 in *Hazelwood School District v. United States, supra*, 433 U.S. at pp. 309–10, 97 S.Ct. at pp. 2742–43. We believe that the same principle would apply to proof of acts of discrimination which occurred prior to the applicable statutory period of limitations with respect to alleged constitutional violations, where the proof shows official action or inaction which has the natural, probable and foreseeable result of increasing or perpetuating discrimination. See *N. A. A. C. P. v. Lansing Board of Education*, 559 F.2d 1042 (6th Cir. 1977).

As Mr. Justice Stevens pointed out in his concurring opinion in *Washington v. Davis, supra*:

"Frequently the most probative evidence of intent will be objective evidence of what actually happened rather than evidence describing the subjective state of mind of the actor. For normally the actor is presumed to have intended the natural consequences of his deeds. This is particularly true in the case of governmental action which is frequently the product of compromise, of collective decisionmaking, and of mixed motivation. It is unrealistic, on the one hand, to require the victim of alleged discrimination to uncover the actual subjective intent of the decisionmaker or, conversely, to invalidate otherwise legitimate action simply because of an improper motive affected the deliberation of a participant in the decisional process. A law conscripting clerics should not be invalidated because an atheist voted for it."

See 426 U.S. at p. 253, 96 S.Ct. at p. 2054. The quotation just cited above is in harmony with the majority decision in *Washington v. Davis, supra*, to the effect that "an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another... Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution." See p. 242, 96 S.Ct. at 2048.

■ While the answer to the question as to whether defendants violated the constitutional rights of plaintiffs during the years 1969–73 is far from clear, we believe that the same evidence is strong proof of pre-Title VII discrimination on the part of defendants. As the Supreme Court has pointed out in *Griggs v. Duke Power Company, supra*, facially neutral policies which have a disparate impact upon minorities which are unrelated to legitimate business necessities constitute violations of Title VII. Also, it has been held by federal courts that "proof that an employer engaged in racial discrimination prior to the effective date of Title VII might in some circumstances support the inference that such discrimination continues, particularly where relevant aspects of the decisionmaking process had undergone little change." *Hazelwood School District v. United States, supra*, 433 U.S. at pp. 309–310, n. 15, 97 S.Ct. at pp. 2742–43, n. 15.

■ After the amendment of Title VII on March 24, 1972, blacks continued to be significantly underrepresented on the Louisville Police Department as to their employment. It will be recalled that in 1972 only two blacks were accepted into the recruit school class of 30 persons, and in 1973 only 2 of 84 persons accepted into the recruit school were black. When these figures are compared with the relevant labor market and when there is taken into consideration the fact that the defendants did not keep records of the number of black and white applicants, it can only be concluded that plaintiffs established a *prima facie* case of discrimination in violation of Title VII during those years it continued the pre-Title VII discrimination. See the excellent explanation in *Green v. Missouri Pacific Railroad Company*, 523 F.2d 1290, 93–94 (8th Cir. 1975), setting out the ways in which a plaintiff can establish a *prima facie* case of discrimination solely through the use of comparative statistics. When, with these statistics, there is considered the failure of the defendants to validate the tests which were used in 1972 and 1973, and the subjective nature of the oral interviews, the violation of Title VII during those years is clear and convincing.

However, as the Supreme Court has pointed out in *Hazelwood School District v. United States, supra,* 433 U.S. at pp. 309, 310, 97 S.Ct. at pp. 2742, 2743, a public employer who, after March 24, 1972, made all of its employment decisions in a wholly nondiscriminatory way would not violate Title VII, even if it had formerly maintained an all-white work force by purposefully excluding Negroes. The defendants, during the years 1974 and 1975, whether it be as a result of the lawsuit filed by the plaintiffs or whether it be as a result of the sincere effort by the Mayor of Louisville and his administration to correct the situation, did not discriminate against blacks during those two years in their employment, and, in fact, admitted into the recruit school a percentage of blacks in excess of those in the relevant labor market.

In 1976 and 1977 a complete reversal from the preceding two years occurred, since only one black officer was appointed in those two years out of a total of 39. During these years 944 applicants originally applied to become police officers. Of those applicants, 222 were black, or 23.5% of the total applicant population. Of these 944 persons, a total of 615 took written examination MPOE 165.1, which was given to the applicants for the first time in 1976. Of the 615, 480 were white and 135 were black. Of the blacks who took the test, 49 passed and 86 failed, so that only 36.3% of the blacks passed. Of the 480 whites who took the examination, 374 passed, representing a showing of 78% of the whites who took the examination passed. After the oral interview which was given, 48 blacks remained on the eligibility list and · 401 whites, so that at that stage, 12% of the persons eligible for appointment were blacks, which, if taken by itself, would probably not represent a substantial under-representation of blacks as compared with the figure of 15% projected by the Court as being the "norm". However the next process of selection for recruitment school was based only upon rank, and only one black ranked in the first 40 eligibles and only five in the top 100 eligibles.

In order to determine whether or not defendants have violated the constitutional rights of · the plaintiffs under either 42 U.S.C. Secs. 1981 or 1983 during the years 1976 and 1977, we must examine the entire eligibility process used by the defendants in the light of *Washington v. Davis, supra,* and in the light of E.E.O.C. guidelines, the standards promulgated by the American Psychology Association and the standards promulgated by the Federal Executive Agency.

Before evaluating the testimony of the expert witnesses who testified concerning the MPOE 165.1, a brief description of the test itself is in order. The test consists of 150 multi-choice questions which are to be answered in 2½ hours. The first 15 questions are questions involving the meaning of words or phrases which, according to the test, are used in police work.

The next set of questions, 16–30, involve map reading, and the person being questioned must choose the best way of getting from one point shown on the map to another.

The third set of questions, 31–45, purport to test the ability to picture how people, objects and different settings appear after they have changed in some way. The majority of the questions in this section are based upon a drawing measuring approximately $1'' \times 1''$, depicting a suspect. Below that drawing are shown drawings of four individuals whose appearance has been altered by such devices as the addition of a beard, mustache, eye glasses, wig, or other contrivances.

Questions 46–60 contained in the next section relate to the order in which steps should be taken to solve a problem or to achieve a goal, particularly with reference to problems which occur in the life of a police officer.

The next section, questions 61–75, is based upon police procedures set out in a descriptive booklet. The questions asked are with reference to three passages contained in the booklet, the first being entitled "First police officer at the scene of a crime", the second "What to do when fired upon", and the third "The role of the police

officer". Questions 61–70 basically refer to on-the-spot decisions which must be made by police officers either at the scene of the crime or when fired upon.

Questions 71–75 are more abstract in their content dealing with the role of the police officer. Questions 76–90 pertain to the understanding of diagrams regarding automobile accidents, some of which involve collisions with pedestrians.

Questions 76–90 relate to the making of on-the-spot decisions in police work that basically test the judgment of the person taking the test and his ability to give right priorities to his choices when faced with two legitimate alternatives.

Questions 106–120 each consist of three pictures and the person taking the examination is to determine the common theme in each series of pictures.

Questions 121–135 relate to the filling out of forms. The examinee is presented with the facts which should be placed on the form and then, with the form as filled out, must determine what portion of the form was incorrectly filled out.

Questions 136–150 are based upon information from the wanted posters in the descriptive booklet. In each case a drawing is shown of the suspect and the examinee is asked to furnish the correct name of the suspect or other information pertaining to the suspect.

■ Before discussing and evaluating the testimony concerning the test, we must take into consideration the guidelines on employer selection procedures promulgated by the Equal Employment Opportunity Commission, hereinafter the EEOC, and found in 29 C.F.R. · Sec. 1607.1 through 1607.14. While these guidelines are not binding on the Court, they are entitled to great deference. See *Espinosza v. Farah Manufacturing Company*, 414 U.S. 86, 94 S.Ct. 334, 38 L.Ed.2d 287 (1973).

It is pointed out in 29 C.F.R. Sec. 1607.-1(b) that where employers have come to rely almost exclusively on tests as a basis for making a decision with respect to hiring and other phases of employment, minority candidates frequently experience disproportionately high levels of rejection by failing to meet score levels that have been established as minimum standards for qualification. The guideline goes on to state that in many instances employers are using the test as a basis for employment decisions without evidence that they are valid predictors of employee job performance. It is further pointed out that a test which does not demonstrate validity and yields lower scores for minorities may result in rejection of many who have the necessary qualifications for the successful work performance.

Title 42 U.S.C. Sec. 2000e–2(h) allows employers "... to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the result is not designed, intended or used to discriminate because of race, color, religion, sex, or national origin."

The defendants, in adopting MPOE 165.1, reached the conclusion that a cutting score of 128 should be used. This is the equivalent of a score of 85%. Also, the defendants, at the time the test was adopted, used it as a ranking device and when the Police Department required new recruits for its training school, the practice was to send, for approval by the Department, the names of the applicants tested by the Department in the order of their numerical ranking, plus two other applicants. Subsequently, the procedures have been changed by the Civil Service Board and the defendants now will certify to the Police Department three times the number of recruits tested by the Department. Since no actual selection has taken place under this procedure, and the testimony is silent as to whether or not the defendants intend to still follow the ranking system, it is not at all clear what effect this procedure will have upon the number of blacks to be admitted to recruit school.

Suffice it to say that under the system used by the defendants during 1976 and 1977, the written test was given a weight of 75% and an oral interview was given a weight of 25%. In addition, the applicants were required to pass a physical test and a

stress test, and to not have any felony convictions and/or numerous misdemeanor convictions, and also to pass a brief interview with the officers of the Police Department. It should also be noted that while 48 blacks of the 135 blacks who took the test passed, only 5 were ranked in the first 100, and only 1 in the first 20, he being ranked number 11.

Under the system then in use of calling approximately 30 to 40 recruits a year, where the second ranking black was 42 on the list, it was apparent that only 1 or 2 blacks at most would be chosen for the recruit school. It should also be noted that the passing rate of blacks with the 128 cutting score was 36%, whereas the passing rate of white applicants was 78%. The difference in statistics is significant and again demonstrates a disparate impact.

MPOE 165.1 was set up by Educational Training Services, an organization which has been outstanding in the field of educational tests. The test was prepared after receiving the advice of IPMA which is The International Personnel Management Asso. and after sending questionnaires to the police officers of nine jurisdictions to determine what the most important tasks of a police officer are and what the most important abilities are to perform those tasks.

After the questionnaires had been returned, it was determined that there were 14 job dimensions which are critical in the occupation of a police officer on patrol and that there were 22 skills which measured those 14 dimensions. However, after more review, the committee appointed to draft the test concluded that 12 abilities should be included in the test specifications. Those 12 abilities are as follows:

1. The ability to understand the meaning of words or ideas (verbal comprehension).

2. The ability to recall a series of items after one or more presentations of that series (serial recall).

3. The ability to recall items of information that are arbitrarily paired (paired associate memory).

4. The ability to remember logical connections and meaningful relationships among previously learned items of information (memory for relationships).

5. The ability to recall the essence of previously studied material (memory for ideas).

6. The ability to order semantic information into the most meaningful sequence (semantic ordering).

7. The ability to find general concepts that will explain information available (induction).

8. The ability to be sensitive to the consequences of given situations (problem sensitivity).

9. The ability to perceive the relevant visual stimuli in the presence of distracting materials (flexibility of closure).

10. The ability to comprehend positions of visual objects in space (spatial orientation).

11. The ability to plan an efficient visual path (spatial scanning).

12. The ability to recognize objects after they have undergone physical change (visualization).

The Court heard a great deal of testimony by expert witnesses for the defendants and by Dr. Richard Barrett for the plaintiffs, as to the content-validity of MPOE 165.1. The only major point upon which the experts agreed was that the City of Louisville had done a commendable job analysis. Although Dr. Barrett accepted that premise, and although he could not think of a better test which could be given, he stated MPOE 165.1 was not content valid, in that the test was attempting to measure what he described as a "construct". A "construct" is defined by the American Psychological Association as follows:

"a formally articulated concept of a trait, i. e., an hypothesized property of people, objects, or events inferred from data."

Dr. Barrett then contended that the abilities that were measured by the test, such as serial recall, induction, visualization, etc.,

were all constructs or traits. Dr. Barrett called to the Court's attention the fact that one of the abilities which is measured in the MPOE 165.1 test is verbal comprehension. He pointed out that verbal comprehension involves precise knowledge of exact meanings of words or distinctions between fine shadings of meanings as well as breadth of knowledge of less familiar words or ideas. On pp. 838–839 of the ETS summary there is a chart which purports to show those activities in which verbal comprehension is a factor. One of the tasks is responding to routine calls for police assistance. As Dr. Barrett points out, the nexus between that type of police duty and the fine knowledge of a series of words is a rather nebulous one.

However, Dr. Barrett did not, to the Court's satisfaction, demonstrate that the remainder of the test was measuring for constructs rather than for content. He did make a sweeping statement to the effect that the entire test was directed at constructs rather than content-validity, involved the measurement of constructs, and, therefore, cannot be measured for a content-validity strategy. He relied upon the Federal Executive Agency guideline in paragraph 12(c)(1), the last sentence of which states "content validity is also not an appropriate strategy when the selection procedure involves knowledges, skills, or abilities, which the employee will be expected to learn on the job." He concluded that since the recruits were not expected to have had any exposure to the knowledges, skills or job abilities required for the job, they would not be expected to be able to perform on the test.

The expert witnesses for the defendants contend that the MPOE 165.1 is content-valid, although it may not satisfy absolutely all of the guidelines set out by EEOC or the Federal Executive Agency. These witnesses were asked specifically with regard to each section of the test whether the questions asked were relevant to a patrolman's job, and they responded in the affirmative, thereby meeting the standards of job-relatedness and content-validity imposed by the Courts in such cases as *Griggs v. Duke*

*Power Company, supra; United States v. City of Chicago, supra;* and *Washington v. Davis, supra.*

However, in the final analysis, expert opinions for both sides are only opinions and may only be given such weight as the Court thinks is consistent with reason.

■ The Court reaches the conclusion that MPOE 165.1 is content-valid. The Court has compared it closely to the test that was given in *Washington v. Davis, supra,* and finds that MPOE 165.1 has greater relevance to the functions of a police officer than does the test in *Washington v. Davis, supra,* which the Supreme Court held to be valid. This conclusion of the Court and a thorough analysis of *Washington v. Davis, supra,* mandate the holding that the defendants have not violated the constitutional rights of the plaintiffs in the years 1976 and 1977 by administering MPOE 165.1.

■ However, our inquiry must now be directed to whether or not the ranking devices used by the defendants which resulted in the disparate impact pointed out by the Court on pages 9 and 14 of this opinion violate the Title VII rights of the plaintiffs. The Court notes first that neither the ranking method of choosing candidates for the Police Force nor the use of a passing score of 85% was endorsed or approved by the national association which formulated the test. While the Court realizes the need of the Police Department to have highly professional, well educated police officers on the Force, it becomes apparent that the ranking device used by the defendants in connection with MPOE 165.1 has precluded the admission of qualified blacks to the Police Recruit School. When this fact is taken into consideration, along with the significant underrepresentation of blacks during the years 1969–73 and the years 1976–77, the Court believes that Title VII requires that the ranking method not be used with respect to black applicants who have achieved the passing grade of 85%.

■ The subsidiary question also arises as to whether or not the passing grade of 85% should be upheld. That passing grade, as the Court has previously noted, resulted in 48 blacks out of a total of 401 applicants who took the examination receiving passing grades. Since that figure represents a percentage of 12, it does not show a disparate impact upon blacks. As a practical matter, it is noted that ordinarily the Police Force places in recruit school approximately 30 to 40 recruits a year, and, therefore, the number of blacks who pass the examination is greater than the total number of recruits, and hence it is not necessary to prohibit the defendants from using at this time 85% as a passing score.

■ In reaching the conclusion that the defendants may not use the ranking method by which to select candidates for the recruit school, the Court notes that there is no testimony in the record to the effect that those persons who scored the highest on the written examination will necessarily be the best qualified policemen. In fact, there is testimony to the effect that the passing grade of 85% and the ranking device have not been specifically approved by the creators of the test. It appears from the testimony that a passing score of 80% might be fairer., Whether 80% or 85% should be utilized as the passing grade, it is apparent that the use of the ranking device violates the mandate of *Griggs v. Duke Power Company, supra,* to the effect that tests which are neutral on their face and even neutral in terms of intent "cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices." See 401 U.S. at p. 430, 91 S.Ct. at p. 853.

We note with great interest the recent case of *Sarabia v. Toledo Police Patrolman's Association,* 601 F.2d 914 (6th Cir. 1979). There the parties had entered into a consent decree which required that validated examinations be used and that the City engage in a comprehensive, affirmative action and minority recruitment program. The goal was to attract sufficient numbers of minority applicants so that, within five years after the order was entered, the ratio of minority employment would be in accordance with the. ratio of minority groups to the total population of Toledo.

Prior to the entry of the order, the appellant had followed the rule of three which required that the Civil Service Commission certify the names of the three candidates standing highest on the eligibility list for each position to be filled. An appointment was then made from this group of three. The district court ordered the appellants to certify for appointment the names of all black applicants who had passed the last examination without regard to their positions on the eligibility list. The Court of Appeals held that the district court acted properly in requiring the appellants to certify these black candidates as eligible for appointment, and in so doing, noted the testimony of expert witnesses to the effect that "all those passing the tests were relatively equally qualified."

While this case is not dispositive of the case at bar, it reflects this Court's thinking that the use of a ranking device such as that used by the defendants should not be sanctioned, where its disproportionate impact upon a minority race is so dramatically exhibited.

■ The Court, by this holding, does not wish to prevent the defendants from continuing to use MPOE 165.1 if it desires to do so. They may, in fact, if they wish to, continue the ranking device to select their white officers. Also, when employing black officers under the remedy devised by this Court, the ranking device may be used to select the most qualified blacks, but may not be used to defeat the specific remedies imposed by this Court.

■ We now come to the remedy portion of this opinion. Where there is a significant underrepresentation of an ethnic minority, and where violations of Title VII have occurred, there is an obligation upon the Court to remedy that past discrimination. In *United States v. City of Chicago,* 549 F.2d 415 (7th Cir. 1977), the court held that:

"... the district court did not abuse its discretion in imposing mandatory quotas upon the Police Department. Under Title VII Congress has equipped the courts with wide discretionary power to remedy statutory violations by fashioning the most complete relief possible. See 42 U.S.C. Sec. 2000e–5(g); *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 763–64, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); *Albemarle*, 422 U.S. at 421, 95 S.Ct. 2362. The district court had a duty to construct a remedy that would both eradicate as far as possible the past effects of discrimination and prevent discrimination in the future. *Albemarle*, 422 U.S. at 417–18, 95 S.Ct. 2362. Moreover, even though Title VII did not become applicable to the City until 1972, the court had an obligation to correct the present consequences of discriminatory conduct that occurred before that date. *Robinson v. Lorillard Corp.*, 444 F.2d 791, 795 (4th Cir.), cert. dismissed, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971); *Local 189, Papermakers v. United States*, 416 F.2d 980, 987–88 (5th Cir. 1970), cert. denied, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1971); *Quarles v. Phillip Morris, Inc.*, 279 F.Supp. 505, 515–16 (E.D.Va.1968).

See, also *United States v. International Brotherhood of Electrical Workers, Local No. 38*, 428 F.2d 144, 149–151 (6th Cir. 1970), and the six other cases cited in *United States v. City of Chicago, supra*, at p. 437.

In order to correct the results of past discrimination, we note that the Louisville Police Force consists of a total of 755 officers. We note, also, that 328 persons were accepted into recruit school during the ten years 1964 through 1973, and in the years 1974 through 1977, 138 persons were admitted to recruit school. No recruits have been admitted since 1977 because of the pendency of this lawsuit. However, examining the statistics for both the ten-year period 1964 through 1973 and the four-year period 1974 through 1977, we find that an average of 33 applicants were accepted each year into recruit school. We note, also, that the Police Force has grown from approximately 600 members in 1970 to more than 700 members in 1977.

We are not advised as to the present needs of the Police Force, but past statistics would indicate that probably 70 persons would be needed in 1979 to make up for the two years during which no appointments have been made. We then assume that normal hiring practices, as exemplified during the years 1964 through 1977, will again occur, and we predict that some 165 candidates will be appointed during the years 1980 through 1984. We, thus, would have a total appointment policy of 235 officers for the years 1979 through 1984.

■ Assuming that there will be 270 appointments to recruit school during the years 1979–84, and assuming that the present Police Force is composed of 700 whites and approximately 55 blacks, the question arises as how best to approximate the 15% goal by the end of 1984. Such approximation cannot be precise, and it may be that the parties will wish to present additional evidence to the Court with regard to the remedy to be fashioned. However, the Court believes that if 1 out of every 3 persons appointed to recruit school is black during the years 1979 through 1984, and if the members of the present Police Force remain in approximately the same racial ratio which they now have, a ratio of approximately 14.5% would result at the end of the period. This should be acceptably close to the relevant labor market of 15% fixed by the Court, and would result in a method which is reasonably precise and capable of ascertainment.

■ The Court finds that plaintiffs failed in their attempts to show specific discriminatory intent and treatment with regard to various persons who testified concerning their failure to be admitted to recruit school primarily during the years 1972 through 1975. Because of the length of this opinion, the Court will not specifically set out its findings as to each of these witnesses, but notes that they were refused employment for nonracial reasons such as obesity, a poor prior record, false applications,

and the failure to pass physical and stress examinations. It is true that in several instances, such as those relating to Mr. Jackson, Sgt. Lyons and Mr. Thornton, they were employed after original disqualification. However, with regard to Mr. Jackson, the delay in his selection was due to his inaction in waiting 8 months before seeing an eye doctor. With reference to Sgt. Lyons, the reasons for disqualifying him at first were at least partially justified because of a reference contained in his military record. He did secure employment shortly after the matter was cleared up, and after he had applied to the Veterans Administration and to Senator Cook for help.

It should be noted that two blacks, Mrs. Norma Boyd and Mrs. Gaines, did suffer unfortunate experiences, in that they scored high on their tests and tried on several occasions to become police officers, and in the case of Mrs. Boyd, she was originally rejected because of the mistake of the receptionist who stated that she had to have college-level credits. However, Mrs. Boyd, on a later application, was failed because she did not meet the minimum height requirement of 5′7½2D. On her final application, Mrs. Boyd also failed because she did not pass the stress test which the Court will refer to in a subsequent paragraph as being nondiscriminatory.

Mrs. Gaines, despite very high marks on her written examination, failed to pass the physical and stress examinations, and, again, for reasons set out below, the Court has found no evidence that the defendants used the physical and stress tests in a discriminatory way.

Although the Supreme Court has invalidated the height requirements for women correctional officers in Alabama in the case of *Dothard v. Rawlinson, supra*, it did so only after plaintiffs produced extensive statistical evidence as to the average height of women in the United States. Plaintiffs, in this case, did not present such evidence either with regard to height requirements or weight requirements.

The Court also finds specifically that the physical and stress tests administered by the defendants are not discriminatory. The Court is well aware that the Police Force must have physically qualified recruits, and recruits who can face the stresses which are imposed upon them by the tremendously demanding nature of their employment. The standards imposed by the Police Force are not overly severe and, in fact, are less demanding than those required by Metropolitan Insurance Company in processing its applicants for life insurance. The plaintiffs made no effort to show other than by cross-examination that either of these tests were statistically discriminatory against blacks, other than to offer evidence that the height requirement was invalid. We note in *Dothard v. Rawlinson, supra*, the Supreme Court held that a height requirement of a minimum of 5′2″ as applied to women who want to be prison guards, was discriminatory and in violation of Title VII, where the district court found that the 5′2″ requirement would exclude 33% of the women of the United States between the ages of 18 and 79, while excluding only 1.3% of the men between the same ages.

Finally, we come to the question of attorneys' fees. While this opinion does not by any means decide all of the issues which may be presented to the Court with regard to the employment practices of the defendants, it recognizes that interim counsel fee awards have been made under both Title VII and under the Civil Rights Fee Awards Act of 1976, now found in 42 U.S.C. Sec. 1988. As stated in *James v. Stockham Valves & Fittings Company*, 559 F.2d 310 (5th Cir.), cert. denied 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978), "There is a danger that litigants will be discouraged from bringing such suits because of the risks of protracted litigation and the extended financial drain represented by such a risk. An award of interim attorneys' fees will prevent extreme cash-flow problems for plaintiffs and their attorneys."

In view of the fact that this case has been before the Court for five and

one-half years, and the plaintiffs have prevailed on matters determining the substantial rights of the parties, the Court is of the opinion that an interim fee should be awarded, which would be deducted, of course, from the sum finally awarded for attorneys' fees for the full course of the litigation. It is recognized that in Title VII cases, the prevailing plaintiffs are ordinarily entitled to recover attorneys' fees. See *Christiansburg Garmet Company v. E. E. O. C.*, 434 U.S. 412, 420–22, 98 S.Ct. 694, 699–700, 54 L.Ed.2d 648 (1978). The same is true with regard to the prevailing plaintiffs under 42 U.S.C. Sec. 1988. See *Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), allowing counsel fees in a Title VII case against governmental defendants, and *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978).

Before a specific award of attorneys' fees is made, counsel for the parties should meet in an effort to determine an appropriate amount. If the parties are unable to agree, counsel for plaintiffs should first submit to the Court, with copies to defendants, a log showing all of their time spent with reference to this action. At a reasonable time after the submission of the log, the Court will hold an evidentiary hearing to determine the amount of fees to be awarded.

A preliminary injunction in accordance with these findings of fact and conclusions of law and opinion has been entered this day.

| Graduation Year | Number of Whites Accepted Into Classes | Number of Blacks Accepted Into Classes |
|---|---|---|
| 1964 | 25 | 2 |
| 1965 | 15 | 0 |
| 1966 | 38 | 2 |
| 1967 | 29 | 2 |
| 1968 | 16 | 0 |
| 1969 | 24 | 1 |
| 1970 | 24 | 0 |
| 1971 | 36 | 0 |
| 1972 | 28 | 2 |
| 1973 | 82 | 2 |